**Keith S. Dubanevich,** OSB No. 975200
**Cody Berne**, OSB No. 142797
STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:   (503) 227-1600
Facsimile:   (503) 227-6840
Email:       kdubanevich@stollberne.com
             cberne@stollberne.com

**Steffan T. Keeton,** (*pro hac vice* forthcoming)
THE KEETON FIRM LLC
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone:   (888) 412-5291
Email:       stkeeton@keetonfirm.com

*Attorneys for Plaintiffs and the Class*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| DOUGLAS PRESSNELL and JILL CLARK, on behalf of themselves and all others similarly situated, | Case No. |
| Plaintiffs, | CLASS ACTION ALLEGATION COMPLAINT |
| v. | |
| KETTLE FOODS HOLDINGS, INC., a Delaware corporation, | <u>DEMAND FOR JURY TRIAL</u> |
| Defendant. | |

Plaintiffs Douglas Pressnell and Jill Clark bring this action on behalf of themselves and all others similarly situated against Defendant Kettle Foods Holdings, Inc. (hereafter "Defendant" or "Kettle"). Plaintiffs make the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

## NATURE OF THE ACTION

"From that very first day, though, a single philosophy has guided us: use only the freshest, **all-natural ingredients** to create intensely flavored, wonderfully craveable potato chips you can feel good about eating."

*Cameron Healy, Founder of Kettle Brand*[1]

1.      This case arises from Defendant's deceptive and misleading practices with respect to its marketing and sale of its Kettle® Brand Chips which are sold in a variety of flavors (collectively, the "Product" or "Products").[2]

2.      Defendant manufactures, markets, and sells its Products throughout the United States including the States of California, Missouri, and Oregon.

---

[1] THE SILICON REVIEW, *Real chips, made with real ingredients, by real people: Kettle Foods, Inc.*, https://thesiliconreview.com/magazine/profile/real-chips-made-with-real-ingredients-by-real-people-kettle-foods-inc (emphasis added).

[2] At the time of this filing, the following Kettle® flavors are included in this definition: Buffalo Bleu, Dill Pickle Chips, Jalapeno Chips, Honey Dijon Chips, Farmstand Ranch Chips, Bourbon Barbecue Chips, Backyard Barbecue Chips, Wasabi Ranch, New York Cheddar Chips, Parmesan Garlic Chips, Spicy Queso, Pepperoncini Chips, Sea Salt & Vinegar Potato Chips, and Organic Sea Salt & Vinegar Potato Chips. This definition is not exhaustive and shall include all of Defendant's products that are similarly deceptively marketed.

3.     Defendant's marketing efforts are designed, developed, directed, and distributed from its headquarters located in Oregon.

4.     Defendant was founded in Salem, Oregon in 1982 with the stated purpose of "[wanting] to develop products of natural integrity" and "[taking] natural foods to the world."[3]

5.     Defendant claims that it is committed to "using only the best, all-natural ingredients."[4]

6.     This commitment is evoked throughout almost every aspect of Kettle's culture and business model. For example, its Salem headquarters "features a display of artistic renderings of the brand's ideological underpinnings — commitments to freshness, clean label, natural foods and sustainability — and a dedication to the state of Oregon."[5]

7.      As company founder Cameron Healy summarizes, "When you open a bag of Kettle brand potato chips, you know you're getting the best tasting, natural chips made with real ingredients by real people."[6]

---

[3] James V. Hillegas-Elting, *Kettle Foods, Inc.*, OREGON ENCYCLOPEDIA (March 17, 2018), https://www.oregonencyclopedia.org/articles/kettle_foods_inc/#.Yjo9kDfMJpQ.

[4] THE SILICON REVIEW, *supra* note 1.

[5] Douglas J. Peckenpaugh, *Natural chip leader Kettle Brand continues innovation*, SNACK FOOD AND WHOLESALE BAKERY(November 9, 2015), https://www.snackandbakery.com/articles/88451-natural-chip-leader-kettle-brand-continues-innovation.

[6] THE SILICON REVIEW, *supra* note 1.

8.      With its focus on the "natural" market, Defendant grew rapidly, and by 2008, annual sales had grown in excess of $235,000,000. With continued growth year after year, Kettle is believed to be an "Oregon-founded, all-natural empire."[7]

9.      Kettle's empire is built on consumers that value "natural" products, a market sector that has grown to almost $50 billion a year.[8] "Kettle Foods' commitment to all-natural products" allowed it to build a customer base in all 50 states and throughout the world.[9]

10.     Specifically targeting the "natural" market, Defendant's marketing efforts stress the purported "natural" nature of its Products.

---

[7] Kelly Clarke, *How Kettle Chips Creates New Flavors*, PORTLAND MONTHLY (Oct. 16, 2012), https://www.pdxmonthly.com/style-and-shopping/2012/10/how-kettle-chips-creates-new-flavors-november-2012.

[8] Jennifer Sweeney, *Report: Natural products growth outpaces total food and beverage*, GROCERY DIVE (Sept. 9, 2019), https://www.grocerydive.com/news/report-natural-products-growth-outpaces-total-food-and-beverage/562353/.

[9] *Kettle Foods, Inc., History*. INTERNATIONAL DIRECTORY OF COMPANY HISTORIES, Vol. 48, St. James Press (2003), *available* at http://www.fundinguniverse.com/company-histories/kettle-foods-inc-history/.

11.    Notably, the principal display panel of all of the Products states "great taste…naturally."



12.    The phrase "great taste…naturally" is a representation to a reasonable consumer that the Products contain only natural ingredients.

13.     This represents that the Product is "natural" to consumers.

14.     Reasonable consumers, including Plaintiffs,  interpret "natural" to mean that the product does not include artificial ingredients.

15.     This interpretation is consistent with Kettle's interpretation of "natural." For example, "In Kettle's case, all ingredients must be natural and, if possible, must come from non-GMO sources."[10]

16.     Further, as Kettle's former Chief Flavor Architect Carolyn Ottenheimer has noted on many occasions, the chips have "a flavor profile that's all natural."[11] As she summarizes, "Kettle's known for bold and authentic flavors. We've worked hard to establish that, as well as our brand's commitment to all-natural ingredients."[12]

17.     Despite the "natural" representation, the Products are not natural because they include artificial ingredients.

18.     Specifically, the Products contain at least two artificial ingredients: Citric Acid and Maltodextrin.

---

[10] Kelly House, *Kettle Chips factory tour reveals anatomy of an Oregon potato chip*, THE OREGONIAN (Jul. 25, 2013), https://www.oregonlive.com/living/2013/07/kettle_chips_factory_tour_reve.html.

[11] *Id.*

[12] Victor Panichkul, *Meet the woman behind Kettle's tasty flavors*, STATESMAN JOURNAL (Jan. 28, 2016), https://www.statesmanjournal.com/story/life/2016/01/28/meet-woman-behind-kettles-tasty-flavors/79303460/.

19.    Plaintiffs and those similarly situated ("Class Members") relied on Defendant's misrepresentations that the Products are "natural" when purchasing the Products.

20.    This deception is not limited to the Products' labels, and rather, it is omnipresent throughout Defendant's marketing efforts.

a.    For example, Defendant uses boxes that prominently feature "ALL NATURAL."



b.  Additionally, in-store marketing efforts reinforce the "natural"
representations on the Products' labels:



21.    Reasonable consumers purchased the Products believing, among other
things, that they were accurately represented. Specifically, reasonable consumers
believed that the Products contained accurate label information and
representations. Reasonable consumers would not have purchased the Products if
they had known about the misrepresentations or would have purchased them on
different terms.

22.     Plaintiffs bring this action individually and on behalf of those similarly situated and seek to represent a National Class, a California Subclass, and a Missouri Subclass. Plaintiffs seek damages, interest thereon, reasonable attorneys' fees and costs, restitution, other equitable relief, and disgorgement of all benefits Defendant has enjoyed from its unlawful and/or deceptive business practices, as detailed herein. In addition, Plaintiffs seek injunctive relief to stop Defendant's unlawful conduct in the labeling and marketing of the Products.

23.     Defendant's conduct violated and continues to violate, *inter alia*, the Oregon Unlawful Trade Practices Act and the consumer protection statutes of California and Missouri. Defendant breached and continues to breach its express and implied warranties regarding the Products. Defendant has been and continues to be unjustly enriched. Accordingly, Plaintiffs bring this action against Defendant on behalf of themselves and Class Members who purchased the Products during the applicable statute of limitations period (the "Class Period").

## JURISDICTION AND VENUE

24.     This Court has personal jurisdiction over Defendant. Defendant purposefully avails itself of the Oregon consumer market and distributes the Products to many locations within the state and hundreds of retail locations throughout the State of Oregon, where the Products are purchased by many consumers every day. Further, Defendant's principal place of business is located within the State of Oregon.

25.    This Court has original subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), which, under the provisions of the Class Action Fairness Act ("CAFA"), explicitly provides for the original jurisdiction of the federal courts in any class action in which at least 100 members are in the proposed Plaintiffs' class and the matter in controversy exceeds the sum of $5,000,000.00, exclusive of interest and costs. Plaintiffs allege that the total claims of individual members of the proposed Class (as defined herein) are well in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs.

26.    Venue is proper in this District under 28 U.S.C. § 1391. Plaintiffs' purchases of Defendant's Products, substantial acts in furtherance of the alleged improper conduct, including the dissemination of false and misleading information regarding the nature, quality, and/or ingredients of the Products, occurred within this District and the Defendant conducts business in this District.

## **PARTIES**

27.    Plaintiff Douglas Pressnell is a citizen of California who purchased the Products during the class period, as described herein. Plaintiff Pressnell's purchases took place in California. In addition, the advertising and labeling on the package of the Products purchased by Plaintiff Pressnell, including the "natural" representations, is typical of the advertising and labeling of the Products purchased by members of the Class.

      a.    Within the past three years, Plaintiff Pressnell purchased multiple
           varieties of Kettle® chips. These purchases were made at retailers

throughout California. Most recently in July 2021, Plaintiff Pressnell purchased Defendant's Backyard Barbeque chips from the Eureka Market in Pacifica, CA at a price of approximately $3.00 per bag.

28.     Plaintiff Jill Clark is a citizen of Missouri, residing in St. Louis County, who purchased the Products during the class period, as described herein. Plaintiff Clark's purchases took place in Missouri. In addition, the advertising and labeling on the package of the Products purchased by Plaintiff Clark, including the "natural" representations, is typical of the advertising and labeling of the Products purchased by members of the Class.

    a.  Within the past five years, Plaintiff Clark purchased Kettle® Sea Salt & Vinegar Potato Chips, Kettle® Organic Sea Salt & Vinegar Potato Chips, Kettle® Jalapeno Potato Chips, and Kettle® Parmesan Garlic Chips. These purchases were made at multiple retailers throughout Missouri. Most recently in February 2021, Plaintiff Clark purchased Defendant's Organic Sea Salt and Vinegar chips from a Whole Foods store located in St. Louis, MO at a price of $3.29 per bag.

29.     Defendant is a Delaware corporation with its principal place of business in Salem, Oregon.

    a.  From its Oregon headquarters, Defendant produces, markets and distributes its consumer food products in retail stores throughout the United States including stores physically located in the State of California and the State of Missouri.

30.    Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

31.    Whenever reference is made in this Complaint to any representation, act, omission, or transaction of a defendant, that allegation shall mean that the defendant did the act, omission, or transaction through its officers, directors, employees, agents, and/or representatives while they were acting within the actual, ostensible, or apparent scope of their authority.

## FACTS

### A. Consumers Value Representations that a Food Is Natural

32.    Consumers demand health-focused food products and will pay premiums for products that fit their dietary desires.[13]

33.    Further, consumers have become increasingly concerned about the effects of artificial and chemical ingredients in grocery products.[14]

---

[13] Shovanna Delventhal, Study Shows Surge in Demand for 'Natural' Products (Updated Feb. 23, 2017) *available at* https://www.investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp.

[14] Julianna M. Butler & Christian A. Vossler, *What is an Unregulated and Potentially Misleading Label Worth? The case of "Natural"-Labelled Groceries*, Environmental & Resource Economics, Springer; European Association of Environmental and Resource Economists, vol. 70(2), pages 545-564 (2017).

34.    Consistent with this focus by consumers, one study concluded: "Thus, one finding is that most people – 87% of our sample – do appear to attribute meaning to 'natural' labelling. The vast majority of respondents stated a belief that 'natural' signals no artificial flavors, colors and/or preservatives."[15]

35.    Reasonable consumers, including Plaintiffs and Class Members, value natural products for important reasons, including the belief that they are safer and healthier than alternative products that are not represented as natural.

36.    As a result, "natural" products are worth more than products that contain artificial ingredients, and consumers pay a premium for products labeled "natural" over products that contain artificial ingredients.[16]

37.    Companies such as Defendant capitalize on consumers' desires for "natural" products.

### B.    Plaintiffs and Other Reasonable Consumers Understand Natural to Mean that a Product Lacks Artificial Ingredients

38.    Plaintiffs and Class Members understand "natural" representations to mean that a product lacks artificial ingredients.

---

[15] *Id.*

[16] *See, e.g., Natural Products Industry Sales up 9.5% to $180bn Says NBJ*, FOOD NAVIGATOR, http://www.foodnavigator-usa.com/Markets/EXPO-WEST-trendspotting-organics-natural-claims/(page)/6 ; *see also* Shoshanna Delventhal, *Study Shows Surge in Demand for "Natural" Products*, INVESTOPEDIA (February 22, 2017), http://www. investopedia.com/articles/investing/022217/study-shows-surge-demand-natural-products.asp  (Study by Kline Research indicated that in 2016, the personal care market reached 9% growth in the U.S. and 8% in the U.K. The trend-driven natural and organic personal care industry is on track to be worth $25.1 billion by 2025).

39.    This interpretation is consistent with the understanding of a

reasonable consumer.

40.    The test to determine if a company's "natural" representation is

deceptive is judged by whether it would deceive or mislead a reasonable person. To

assist in ascertaining what a reasonable consumer believes the term natural means,

one can look to regulatory agency guidance.

41.    In 2013, the United States Department of Agriculture ("USDA") issued

a Draft Guidance Decision Tree for Classification of Materials as Synthetic or

Nonsynthetic (Natural). In accordance with this decision tree, a substance is

natural—as opposed to synthetic—if: (a) it is manufactured, produced, or extracted

from a natural source (i.e. naturally occurring mineral or biological matter); (b) it

has not undergone a chemical change (i.e. a process whereby a substance is

transformed into one or more other distinct substances) so that it is chemically or

structurally different than how it naturally occurs in the source material; or (c) the

chemical change was created by a naturally occurring biological process such as

composting, fermentation, or enzymatic digestion or by heating or burning

biological matter.[17]

---

[17] U.S. Department of Agriculture, Draft Guidance Decision Tree for Classification of Materials as Synthetic or Nonsynthetic, March 26, 2013, available at https://web.archive.org/web/20140818174458/http://www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRDC5103308.

42.    The FTC has warned companies that the use of the term "natural" may be deceptive: [18]

> Marketers that are using terms such as natural must ensure that they can substantiate whatever claims they are conveying to reasonable consumers. If reasonable consumers could interpret a natural claim as representing that a product contains no artificial ingredients, then the marketer must be able to substantiate that fact.

43.    Likewise, the Food and Drug Administration ("FDA") warns that any "natural" labeling on products must be "truthful and not misleading."[19]

44.    Surveys and other market research, including expert testimony Plaintiffs intend to introduce, will demonstrate that the term "natural" is misleading to a reasonable consumer because the reasonable consumer believes that the term "natural," when used to describe goods such as the Products, means that the goods are free of synthetic ingredients. For example, according to a consumer survey, "[e]ighty-six percent of consumers expect a 'natural' label to mean processed foods do not contain any artificial ingredients."[20]

---

[18] 75 Fed. Reg. 63552, 63586 (Oct. 15, 2010).

[19] U.S. Food and Drug Administration, Small Business & Homemade Cosmetics: Fact Sheet, available at http://www.fda.gov/Cosmetics/ResourcesForYou/Industry/ucm388736.htm#7.

[20] Urvashi Rangan, Comments of Consumers Union on Proposed Guides for Use of Environmental Marketing Claims, 16 C.F.R. Part 260, Notice of the Federal Trade Commission (2010), available at https://www.ftc.gov/sites/default/files/documents/public_comments/guides-use-environmental-marketing-claims-project-no.p954501-00289%C2%A0/00289-57072.pdf (also accessible as Comment 58 at http://www.ftc.gov/policy/publiccomments/initiative-353).

45.     A reasonable consumer's understanding of the term "natural" comports with that of federal regulators and common meaning. That is, the reasonable consumer understands the representation that a product is "natural" to mean that it does not contain any artificial ingredients.[21]

46.     The reasonable consumer's understanding of "natural" also comports with the understanding of Kettle insiders:

  a. **Former Chief Flavor Architect:** Carolyn Ottenheimer

    i.   "a flavor profile that's all natural."[22]

    ii.  "Kettle's known for bold and authentic flavors. We've worked hard to establish that, as well as our brand's commitment to all-natural ingredients."[23]

  b. **Founder:** Cameron Healy

    i.   "[We] use only the freshest, all-natural ingredients."[24]

**C. <u>Defendant Represents that the Products are Natural</u>**

47.     Defendant capitalizes on consumers' preferences for natural products by making representations to consumers on its Products that they are natural.

48.     The front label of every Product states the words "great taste…naturally."

---

[21] Butler & Vossler, *supra* note 14. "The vast majority of respondents stated a belief that 'natural' signals no artificial flavors, colors and/or preservatives." *Id.*

[22] House, *supra* note 10.

[23] Panichkul, *supra* note 12.

[24] THE SILICON REVIEW, *supra* note 1.

49.    The following image is an example of that representation being prominently made on the front of the product:



50.    Based on the language that appears on the front of each product, Plaintiffs reasonably believed that Products contained only natural ingredients.

51.    The phrase "great taste…naturally" is a representation to a reasonable consumer that the Products contain only natural ingredients.

52.    Throughout its marketing efforts, Defendant reinforces that its Products are "natural."

53.    For example, Defendant uses boxes that prominently feature "ALL NATURAL."



54.    Additionally, in-store marketing efforts reinforce the "natural" representations on the Products' labels.



**D.  Defendant's Representations Are False, Misleading, and Deceptive**

55.    Despite representing that the Products are "natural," the Products contain artificial ingredients.

56.    Thus, Defendant's representations that the Products are "natural" is false, misleading, and deceptive because the Products contain ingredients that are, as set forth and described below, synthetic.[25]

---

[25] Other ingredients in the Products may also be artificial as well. Plaintiffs' investigation is ongoing and may seek to amend the Complaint to specify other artificial ingredients in the future.

a. **Maltodextrin** is a factory-produced texturizer that is created by complex processing. To produce Maltodextrin, acids, enzymes, or acids and enzymes[26] are applied in sequence to a starch slurry to induce partial hydrolysis (saccharification). In other words, the acids or enzymes convert or depolymerize starch to glucose or maltose molecules.[27] Once maltose content is high enough for Maltodextrin, the acids or enzymes are neutralized, removed or deactivated, and the resulting product is then refined, purified, and concentrated.[28]

b. **Citric Acid** is recognized by the FDA and other federal agencies as an artificial substance.[29] Citric acid is added as a synthetic preservative, flavorant, and acidity regulator. It is commonly manufactured through solvent extraction or mycological fermentation of bacteria.[30] While the chemical's name has the word "citric" in it, citric acid is not extracted from fruit. Rather, it is industrially manufactured by fermenting

---

[26] CORN REFINERS ASSOCIATION, NUTRITIVE SWEETENERS FROM CORN 20 (2006), 17-19 *available at* http://www.corn.org/wpcontent/uploads/2009/12/NSFC2006.pdf.

[27] H. Guzman-Maldonado, Amylolytic Enzymes and Products Derived from Starch: A Review, 35(5) CRIT. REV. FOOD SCI. NUTR. 373 (Sept. 1995).

[28] CORN REFINERS ASSOCIATION, *supra* note 26.

[29] *See* FDA Informal Warning Letter to the Hirzel Canning Company (August 29, 2001) ("the addition of calcium chloride and citric acid to these products preclude use of the term 'natural' to describe this product."); U.S. International Trade Commission, Synthetic Organic Chemical Index, USCTIC Pub. 2933, at 3-105 (Nov. 1995).

[30] 21 C.F.R. § 184.1033(a).

genetically modified strains of the black mold fungus *Aspergillus niger*.[31]

57.    Consumers lack the meaningful ability to test or independently ascertain or verify whether a product is natural, especially at the point of sale. Consumers would not know that the Products contain unnatural, synthetic ingredients, by reading the ingredients label.

58.    Discovering that the ingredients are not natural and are actually synthetic requires an investigation beyond that of the skills of the average consumer. That is why, even though the ingredients listed above are identified on the back of the Products' packaging in the ingredients listed, the reasonable consumer would not understand – nor are they expected to understand – that these ingredients are synthetic.

59.    Moreover, the reasonable consumer is not expected or required to scour the ingredients list on the back of the Products in order to confirm or debunk Defendant's prominent front-of-the-product claims, representations, and warranties that the Products are "natural."

60.    Defendant did not disclose that the above listed ingredients are synthetic ingredients anywhere on the product. A reasonable consumer understands

---

[31] *See*, *e.g.*, Belen Max, et al. *Biotechnological Production of Citric Acid*, BRAZILIAN JOURNAL OF MICROBIOLOGY, 41.4 Sao Paolo (Oct./Dec. 2010) and Sweis, Iliana, and Bryan C Cressey. *Potential role of the common food additive manufactured citric acid in eliciting significant inflammatory reactions contributing to serious disease states: A series of four case reports*, TOXICOLOGY REPORTS, 5.808 (Aug. 9, 2018).

Defendant's "natural" claims to mean that the Products are "natural" and do not contain synthetic ingredients.

61.    Consumers rely on label representations and information in making purchasing decisions.

62.    The marketing of the Products as "natural" in a prominent location on the labels of all of the Products, throughout the Class Period, evidences Defendant's awareness that "natural" claims are material to consumers.

63.    Defendant's deceptive representations are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

64.    Plaintiffs and the Class Members reasonably relied to their detriment on Defendant's misleading representations and omissions.

65.    Defendant's false, misleading, and deceptive misrepresentations and omissions are likely to continue to deceive and mislead reasonable consumers, as they have already deceived and misled Plaintiffs and the Class Members.

**E. <u>Defendant's Deceptive Conduct Caused Plaintiffs' and Class Members' Injuries</u>**

66.    In making the false, misleading, and deceptive representations and omissions described herein, Defendant knew and intended that consumers would pay a premium for Products labeled "natural" over comparable products not so labeled and marketed.

67.    As an immediate, direct, and proximate result of Defendant's false, misleading, and deceptive representations, Defendant injured Plaintiffs and the Class Members in that Plaintiffs and the Class Members:

    a.    Paid a sum of money for Products that were not what Defendant represented;

    b.    Paid a premium price for Products that were not what Defendant represented;

    c.    Were deprived of the benefit of the bargain because the Products they purchased were different from what Defendant warranted; and

    d.    Were deprived of the benefit of the bargain because the Products they purchased had less value than what Defendant represented.

68.    Plaintiffs and the Class Members paid for Products that were "natural" but received Products that were not "natural." The products Plaintiffs and the Class Members received were worth less than the products for which they paid.

69.    Based on Defendant's misleading and deceptive representations, Defendant was able to, and did, charge a premium price for the Products over the cost of competitive products not bearing the misrepresentations.

70.    Plaintiffs and the Class Members paid money for the Products. However, Plaintiffs and the Class Members did not obtain the full value of the advertised Products due to Defendant's misrepresentations and omissions. Plaintiffs and the Class Members purchased, purchased more of, and/or paid more for, the Products than they would have had they known the truth about the

Products. Consequently, Plaintiffs and the Class Members have suffered injury in fact and lost money as a result of Defendant's wrongful conduct.

71.   Defendant knew that consumers will pay more for a product marketed as "natural," and intended to deceive Plaintiffs and putative Class Members by labeling and marketing the Products as purportedly natural products.

72.   Plaintiffs and Class Members paid for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiffs and Class Members paid for the Products based on Defendant's misrepresentations that they are "natural," Plaintiffs and Class Members suffered an injury in the amount paid.

73.   Additionally, Plaintiffs and Class Members paid a premium for the Products over and above comparable products that did not purport to be "natural." Given that Plaintiffs and Class Members paid a premium for the Products based on Defendant's misrepresentations that they are "natural," Plaintiffs and Class Members suffered an injury in the amount of the premium paid.

## CLASS DEFINITIONS AND ALLEGATIONS

74.   Plaintiffs, pursuant to Federal Rule of Civil Procedure 23, brings this action on behalf of the following classes (collectively, the "Class," "Classes," and "Class Members"):

a. California Subclass: All persons who purchased Defendant's Products within the State of California and within the applicable statute of limitations period;

b. Missouri Subclass: All persons who purchased Defendant's Products within the State of Missouri and within the applicable statute of limitations period; and

c. Nationwide Class: All persons who purchased Defendant's Products within the United States and within the applicable statute of limitations period.

75.     Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers, and directors, those who purchased the Products for resale, all persons who make a timely election to be excluded from the Classes, the judge to whom the case is assigned and any immediate family members thereof, and those who assert claims for personal injury.

76.     The members of the Classes are so numerous that joinder of all Class Members is impracticable. Defendant has sold, at a minimum, millions of units of the Products to Class Members.

77.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the putative classes that predominate over questions that may affect individual Class Members include, but are not limited to the following:

a.  whether Defendant's Products contain ingredients or substances that are not "natural";

b.  whether Defendant misrepresented material facts concerning the Products on the label of every product;

c.  whether Defendant's conduct was unfair and/or deceptive;

d.  whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon them by Plaintiffs and the Classes;

e.  whether Plaintiffs and the Class are entitled to equitable and/or injunctive relief;

f.  whether Defendant breached express warranties to Plaintiffs and the Classes;

g.  whether Plaintiffs and the classes have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

78.  Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like all members of the classes, purchased Defendant's Products bearing the natural representations and Plaintiffs sustained damages from Defendant's wrongful conduct.

79.    Plaintiffs will fairly and adequately protect the interests of the classes and has retained counsel that is experienced in litigating complex class actions. Plaintiffs have no interests which conflict with those of the classes.

80.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, making it impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

81.    The prerequisites to maintaining a class action for equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the classes, thereby making appropriate equitable relief with respect to the classes as a whole.

82.    The prosecution of separate actions by members of the classes would create a risk of establishing inconsistent rulings and/or incompatible standards of

conduct for Defendant. For example, one court might enjoin Defendant from performing the challenged acts, whereas another might not. Additionally, individual actions could be dispositive of the interests of the classes even where certain Class Members are not parties to such actions.

## COUNT I
## Violation of Oregon's Unlawful Trade Practices Act ("UTPA")
### (As To Nationwide Class)

83.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84.    Plaintiffs and Defendant are "persons" within the meaning of ORS 646.605(4).

85.    Plaintiffs and Class Members purchased goods and services in "trade" and "commerce" as meant by ORS 646.605(6)(a).

86.    Defendant engaged in the design, development, manufacturing, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the Product.

87.    The UTPA prohibits unfair or deceptive acts in trade or commerce. Due to the conduct described herein, Defendant willfully, knowingly, and recklessly used and employed a method, act or practice declared unlawful under the UTPA:

     a.    Defendant violated ORS 646.608(1)(b) by causing the likelihood of confusion or of misunderstanding as to the source of goods.

    b.   Defendant violated ORS 646.608(1)(e) by representing that goods have characteristics, ingredients, quantities or qualities that the goods do not have.

    c.   Defendant violated ORS 646.608(1)(g) by representing that goods are of a particular standard, quality or grade when they are of another.

    d.   Defendant violated ORS 646.608(1)(i) by advertising goods with intent not to provide them as advertised.

88.    A product containing only natural ingredients is inherently worth more than the actual Product purchased by Plaintiffs, which is a product containing artificial ingredients.

89.    Defendant's violations were willful, knowing, and/or reckless as Defendant knew or should have known that the conduct complained of herein caused the likelihood of confusion or of misunderstanding about the Product.

90.    Defendant intended to confuse and mislead consumers about the Product's "natural" character, and knew it could charge more for such a Product than one containing artificial ingredients.

91.    As a result of Defendant's willful, knowing, and/or reckless violations of the UTPA as described above, Plaintiffs and the Class Members suffered an ascertainable loss of money or property.

92.    Plaintiffs and the Class Members further seek an order declaring Defendant has violated the UTPA.

93.    Plaintiffs and the Class Members also seek equitable relief, an injunction, and attorneys' fees and costs pursuant to ORS 646.638(3).

94.    Plaintiffs and the Class Members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $200 (whichever is greater), punitive damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

**COUNT II**
**Violation of California's Unfair Competition Law ("UCL"),**
**CAL. BUS. & PROF. CODE §§ 1720, et seq.**
**(In the Alternative to Count I and**
**on behalf of Plaintiff Pressnell and the California Subclass)**

95.    Plaintiff Pressnell repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.    Plaintiff Pressnell brings this Count individually and on behalf of the members of the California Subclass.

97.    Defendant is subject to California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. The UCL provides, in pertinent part: "Unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising …."

98.    Defendant violated the "unlawful" prong of the UCL by violating California's Consumer Legal Remedies Acts ("CLRA") and False Advertising Law ("FAL"), as alleged herein.

99.    Defendant's misrepresentations and other conduct, described herein, violated the "unfair" prong of the UCL in that its conduct is substantially injurious

to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the gravity of the conduct outweighs any alleged benefits.

100.   Defendant violated the "fraudulent" prong of the UCL by misrepresenting that the Products are "natural" when, in fact, they are made with synthetic ingredients.

101.   Plaintiff Pressnell and the California Subclass Members lost money or property as a result of Defendant's UCL violations because: because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients (b) they paid a substantial price premium compared to other food products due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

102.   In accordance with Bus. & Prof. Code § 17203, Plaintiff Pressnell seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

103.   Plaintiff Pressnell and the California Subclass also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through unlawful, unfair, and fraudulent acts.

**COUNT III**
**Violation of The False Advertising Law ("FAL"),**
**CAL. BUS. & PROF. CODE §§ 17500, et seq.**
**(In the Alternative to Count I and**
**on behalf of Plaintiff Pressnell and the California Subclass)**

104.    Plaintiff Pressnell repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

105.    Plaintiff Pressnell brings this Count individually and on behalf of the members of the California Subclass.

106.    California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, et seq., makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the public in this state, ... in any advertising device ... or in any other manner or means whatever, including over the Internet, any statement, concerning ... personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

107.    Defendant committed acts of false advertising, as defined by §§ 17500, et seq., by misrepresenting that the Products are "natural" when they are not.

108.    Defendant knew or should have known through the exercise of reasonable care (i. e. pre-market testing) that its representations about the Products were untrue and misleading.

109.    Defendant's actions in violation of §§ 17500, et seq. were false and misleading such that the general public is and was likely to be deceived.

110.    Plaintiff Pressnell and the California Subclass Members lost money or property as a result of Defendant's FAL violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients; (b) they paid a substantial price premium compared to other food products due to Defendant's misrepresentations; and (c) the Products do not have the characteristics, uses, or benefits as promised.

111.    Defendant profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

112.    As a result, Plaintiff Pressnell, the California Subclass, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

113.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff Pressnell, on behalf of himself and the California Subclass, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint. Further, Plaintiff Pressnell seeks an Order of this Court ordering Defendant to fully disclose the true nature of their misrepresentations. Plaintiff Pressnell additionally requests an Order requiring Defendant to disgorge their ill-gotten gains and/or award full restitution of all monies wrongfully acquired by Defendant by means of such acts of false advertising, plus interest and attorneys' fees so as to restore any and all monies which were acquired and obtained by means of such untrue and misleading advertising, misrepresentations and omissions, and which ill-gotten

gains are still retained by Defendant. Plaintiffs Pressnell and those similarly situated may be irreparably harmed and/or denied an effective and complete remedy if such an Order is not granted.

**COUNT IV**
**Violation of The Consumer Legal Remedies Act ("CLRA"),**
**CAL. CIV. CODE §§ 1750, et seq.**
**(In the Alternative to Count I and**
**on behalf of Plaintiff Pressnell and the California Subclass)**

114.    Plaintiff Pressnell repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

115.    Plaintiff Pressnell brings this Count individually and on behalf of the members of the California Subclass.

116.    This cause of action is brought pursuant to California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750 (the "CLRA").

117.    Plaintiff and the other members of the California Subclass are "consumers," as the term is defined by California Civil Code § 1761(d), because they bought the Products for personal, family, or household purposes.

118.    Plaintiff Pressnell, the other members of the California Subclass, and Defendant have engaged in "transactions," as that term is defined by California Civil Code § 1761(e).

119.    The conduct alleged in this Complaint constitutes unfair methods of competition and unfair and deceptive acts and practices for the purpose of the

CLRA, and the conduct was undertaken by Defendant in transactions intended to result in, and which did result in, the sale of goods to consumers.

120.    As alleged more fully above, Defendant have violated the CLRA by falsely representing to Plaintiff Pressnell and the other members of the California Subclass that the Products are "natural" when in fact they are made with synthetic ingredients.

121.    As a result of engaging in such conduct, Defendant has violated California Civil Code § 1770(a)(5), (a)(7) and (a)(9).

122.    Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff Pressnell provided notice to Defendant of its alleged violations of the CLRA, demanding that Defendant correct such violations, and providing it with the opportunity to correct its business practices. Notice was sent via certified mail, return receipt requested on March 21, 2022. As of the date of filing this complaint, Defendant has not responded. Accordingly, if after 30 days no satisfactory response to resolve this litigation on a class-wide basis has been received, Plaintiff Pressnell will seek leave to amend this request to seek restitution and actual damages as provided by the CLRA.

123.    Pursuant to California Civil Code § 1780, Plaintiff Pressnell seeks injunctive relief, reasonable attorneys' fees and costs, and any other relief that the Court deems proper.

**COUNT V**
**Violation of Missouri's Merchandising Practices Act, ("MMPA")**
**Deception and Misrepresentation**
**(In the Alternative to Count I and**
**on behalf of Plaintiff Clark and the Missouri Subclass)**

124.    Plaintiff Clark repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

125.    Plaintiff Clark brings this Count individually and on behalf of the members of the Missouri Subclass.

126.    The acts and practices engaged in by Defendant, and described herein, constitutes unlawful, unfair and/or fraudulent business practices in violation of the Missouri Merchandising Practices Act ("MMPA"), Mo. Rev. Stat. §§ 407.010, et seq.

127.    Defendant's actions alleged herein violated, and continue to violate, the MMPA.

128.    Defendant is a "person" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(5).

129.    The goods purchased from Defendant are "merchandise" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(4).

130.    The transactions resulting in purchases of goods from Defendant in Missouri are a "sale" within the meaning of the MMPA. Missouri Revised Statutes § 407.010(6).

131.    Defendant engaged in unlawful practices including deception, false promises, and misrepresentation in connection with the sale, distribution or advertisement of the Products in violation of Mo. Rev. Stat. § 407.020, which states in relevant part as follows:

> 407.020. 1. The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice. ... Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

132.    Plaintiff Clark and Missouri Subclass Members purchased the Products, products that were deceptively represented as "natural" in violation of the Missouri Merchandising Practices Act, and as a result Plaintiff Clark suffered economic damages, in that the products she and other Class Members purchased was worth less than the products they thought they had purchased had Defendant's representations been true.

133.    At all times relevant herein, Plaintiff Clark was unaware that the Products were not "natural."

134.    At all times relevant herein, Plaintiff Clark was unaware that the Products contained artificial ingredients.

135.    Defendant's labeling for the Products does not disclose that the Products are not "natural."

136.    Defendant's labeling for the Products does not disclose that the Products contain artificial ingredients.

137.    Defendant's representations that the Products are "natural" is a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

138.    As a direct proximate result of the above-described practices, Plaintiff Clark and Missouri Subclass Members suffered ascertainable loss of money due to the purchasing of the Products.

139.    Appropriate injunctive relief is necessary to prevent Defendant's MMPA violations from continuing. If Defendant's violations of the MMPA are not stopped by such injunctive relief, Plaintiff Clark and the members of the Missouri Subclass will continue to suffer injury.

140.    "A misrepresentation is an assertion that is not in accord with the facts." 15 CSR 60-9.070.

141.    As described further herein, the presence or lack of artificial chemicals in a product is a fact which may "induce a reasonable consumer to act, respond or change his/her behavior in any substantial manner."

142.    Defendant's representations that the Products were "natural" – when the Products contained multiple artificial ingredients - is a violation of the Missouri Merchandising Practices Act, as further stated herein, and was a material misrepresentation.

143.    Defendant's representations that the ingredients contained within the Products are natural is a material misrepresentation.

144.    Defendant's misrepresentations were material because they were likely to deceive reasonable consumers.

145.    Plaintiff Clark purchased the Products for personal, family, or household purposes.

146.    Plaintiff Clark suffered an ascertainable loss as a result of Defendant's unlawful conduct because the actual value of the Products as purchased was less than the value of the Products as represented. In addition, the Products are legally worthless.

147.    As a direct and proximate result of Defendant's deceptive acts and practices, Plaintiff Clark and the Missouri Subclass have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from not receiving the benefit of their bargain in purchasing the Products.

148.    Plaintiff Clark and other members of the Missouri Subclass lost money or property as a result of Defendant's violations because: (a) they would not have purchased the Products on the same terms if they knew that the Products were made with synthetic ingredients (b) they paid a substantial price premium compared to other food products due to Defendant's misrepresentations and deceptions; and (c) the Products do not have the characteristics, uses, or benefits as promised.

149.    Plaintiff Clark and the Missouri Subclass seek all monetary and non-monetary relief allowed by law, including punitive damages, attorneys' fees and costs, and any additional relief this Court deems necessary or proper.

## COUNT VI
## Breach of Express Warranty
## (As to Nationwide Class)

150.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

151.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against the Defendant.

152.    Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, expressly warranted and represented that the Products are "natural."

153.    Both representations made by the Defendant provide the Plaintiffs and Class Members with an express warranty in the form of written affirmations of fact promising those representations.

154.    The above affirmations of fact were not couched as "belief" or "opinion," and were not "generalized statements of quality not capable of proof or disproof."

155.    Defendant's express warranties, and its affirmations of fact and promises made to Plaintiffs and Class Members regarding the Products, became part of the basis of the bargain between Defendant and Plaintiffs and the Classes, thereby creating an express warranty that the Products would conform to those affirmations of fact, representations, promises, and descriptions.

156.    The Products do not conform to the express warranty because they contain ingredients that are synthetic.

157.    Prior to the filing of this complaint, Plaintiffs timely notified Defendant of these breaches by a letter sent via the United States Postal Service.

158.    Defendant has had a reasonable opportunity to cure its breach of written warranties and any additional opportunity to cure would be unnecessary and futile.

159.    As a direct and proximate cause of Defendant's breach of express warranty, Plaintiffs and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew the truth about the Products' artificial ingredients and composition; (b) they paid a substantial price premium based on Defendant's express warranties; and (c) the Products do not have the characteristics, uses, or benefits as promised.


### COUNT VII
### Unjust Enrichment
### (As to Nationwide Class)

160.    Plaintiffs repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

161.    Plaintiffs brings this claim individually and on behalf of the members of the proposed Classes against the Defendant.

162.    At all times relevant hereto, Defendant deceptively marketed, advertised, and sold merchandise to Plaintiffs and the Classes.

163.    Plaintiffs and members of the Classes conferred upon Defendant nongratuitous payments for the Products that they would not have if not for Defendant's deceptive advertising and marketing. Defendant accepted or retained the nongratuitous benefits conferred by Plaintiffs and members of the Classes, with full knowledge and awareness that, as a result of Defendant's deception, Plaintiffs and members of the Classes were not receiving a product of the quality, nature, fitness, or value that had been represented by Defendant and reasonable consumers would have expected.

164.    Defendant has been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class Members' purchases of the Products. Retention of those monies under these circumstances is unjust and inequitable because of Defendant's misrepresentations about the Products, which caused injuries to Plaintiffs and Class Members because they would not have purchased the Products if the true facts had been known or would have only paid less.

165.    Because Defendant's retention of the non-gratuitous benefits conferred on it by Plaintiffs and members of the Classes is unjust and inequitable, Defendant must pay restitution to Plaintiffs and members of the Classes for their unjust enrichment, as ordered by the Court.

## **RELIEF DEMANDED**

166.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

a.    For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representative of the Classes and Plaintiffs' attorneys as Class Counsel to represent the members of the Classes;

b.    For an order declaring Defendant's conduct violates the statutes and laws referenced herein;

c.    For an order awarding, as appropriate, compensatory and monetary damages, statutory damages, restitution and/or disgorgement to Plaintiffs and the Classes for each and every cause of action;

d.    For an order requiring Defendant to immediately cease and desist from selling their misbranded Products in violation of law; enjoining Defendant from continuing to label, market, advertise, distribute, and sell the Products in the unlawful manner described herein; and ordering Defendant to engage in corrective action;

e.    For prejudgment and postjudgment interest on all amounts awarded;

f.    For an order awarding punitive damages; and

g.    For an order awarding attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiffs demands a trial by jury on all causes of action and issues so triable.

Dated this 25th day of March, 2022.

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

By: s/ Keith S. Dubanevich

**Keith S. Dubanevich,** OSB No. 975200
**Cody Berne**, OSB No. 142797
209 SW Oak Street, Suite 500
Portland, OR 97204
Telephone:   (503) 227-1600
Facsimile:    (503) 227-6840
Email:         kdubanevich@stollberne.com
                   cberne@stollberne.com

and

**Steffan T. Keeton,** (*pro hac vice* forthcoming)
THE KEETON FIRM LLC
100 S Commons, Suite 102
Pittsburgh, PA 15212
Telephone:   (888) 412-5291
Email:         stkeeton@keetonfirm.com

*Attorneys for Plaintiffs and the Class*